**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MARY C. MAXWELL,** | ) | |
| | ) | **No. 16 C 6101** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Magistrate Judge Michael T. Mason** |
| **NANCY A. BERRYHILL, Acting** | ) | |
| **Commissioner of the U.S. Social** | ) | |
| **Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Claimant Mary Maxwell ("Claimant") brings this action seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), denying Claimant's request for disability insurance benefits ("DIB") and supplemental security income ("SSI") under §§ 404, 416(i), and 423(d) of the Social Security Act (the "SSA"). The parties have filed a cross-motions for summary judgment [17, 24]. This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, Claimant's motion for summary judgment [17] is denied, and the Commissioner's cross-motion [24] is granted.

## I. BACKGROUND

### A. Procedural History

On May 24, 2012, Claimant filed a Title II DIB application and a Title XVI SSI application, alleging a disability onset date of December 31, 2000. (R. 281–90.) Her claim was denied initially on September 19, 2012, and again upon reconsideration August 20, 2014. (R. 135–38.) After both denials, Claimant filed a hearing request on

August 28, 2014, pursuant to 20 C.F.R. § 404.929 *et seq.* (R. 173.) A hearing was held on November 5, 2015, before an Administrative Law Judge ("ALJ").[1] (R. 234.) Claimant appeared along with her representative. (R. 47–99.) A Vocational Expert ("VE") was also present and offered testimony. (*Id.*) On December 4, 2015, the ALJ issued an unfavorable written decision denying Claimant's claims for DIB and SSI. (R. 18-46.) Claimant then requested review by the Appeals Council. (R. 7–10.) On April 11, 2016, the Appeals Council denied her request for review, at which time the ALJ's decision became the final decision of the Commissioner. (R. 1–6.); *Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001). Claimant subsequently filed this action in the District Court.

**B. Medical Evidence**

Claimant was born on February 20, 1970 and was forty-five years old at the time the ALJ issued her decision. (R. 52.) She seeks DIB and SSI for disabling conditions stemming from bipolar disorder, partial vertebra removal, a shattered kneecap, and chronic migraines. (R. 313.)

**1. Treating Physicians**

We note at the outset that claimant's records reference several injuries and conditions that are not detailed in the administrative record, including a fractured pelvis and vertebra injury as a result of an automobile accident in 1991, (R. 59, 1067), a history of cervical cancer, (R. 746, 914), a stroke in early 2014, (R. 717, 855), and hypertension, (R. 732). In addition, much of the administrative record reflects sporadic

---

[1] Claimant's hearing was initially scheduled for August 25, 2015, (R. 196); however, after she failed to report on that date, her hearing was rescheduled for November 5, 2015. (R. 233-34.)

emergency room visits and hospitalizations, rather than consistent care from primary care physicians.

Claimant was taken to Elgin Mental Health Center in May of 2000 for depression and suicidal thoughts; she explained that she had lost her job and was struggling to cope with her mother's death. (R. 553–54.) She was treated there for one month and then released with a diagnosis including bipolar disorder. (R. 529, 532.)

Subsequently, in February of 2001, Claimant voluntarily admitted herself to another psychiatric care facility where she again expressed suicidal ideation. (R. 487.) Claimant reported a history of bipolar disorder; however, her doctor noted that "she did not give clear-cut symptoms or show signs of symptomatology" of bipolar disorder (R. 488.). It was also noted that her presentation was much more consistent with substance abuse. (*Id.*) While Claimant did admit to a history of cocaine, marijuana, and alcohol use, she reported that she had recently stopped using those substances. (*Id.*) Her records indicated that her thought process was "clear, logical and coherent with no disorganization or delusions." (*Id.*) Claimant's memory was intact and aside from showing signs of chemical dependency, she had no other active medical problems. (*Id.*) She was discharged from care five weeks later. (R. 487.)

Claimant was admitted to Alexian Brothers Medical Center in September of 2008 following an incident where she consumed alcohol and attempted to commit suicide by overdosing on 100 Tylenol P.M. pills. (R. 576, 578.) Her doctors performed a gastric lavage, and subsequently transferred her to psychiatric care at Alexian Brothers Behavioral Health for an alcohol detox and management of her psychiatric issues. (R. 576.)

Claimant next presented for medical care in May of 2009 at Advocate Condell Medical Center ("Advocate") due to pain and swelling in her left knee. (R. 622.) A magnetic resonance imaging ("MRI") from the same month revealed she had large knee joint effusion. (R. 624.) Her left knee was subsequently injured in September of 2009 when she fell down five steps. (R. 610-16.) An x-ray of her knee revealed mild hypertrophic and degenerative changes, but there was no fracture. (R. 621.)

Two months later, Claimant injured her left knee again when it "gave out" beneath her. (R. 600–05.) Her doctor recommended that she ice and elevate her knee, in addition to following-up with her orthopedist. (R. 605.)

In March 2010, Claimant slipped and fell on ice, aggravating her existing knee pain. (R. 648.) Once again, an x-ray of her left knee revealed mild hypertrophic changes, and she was diagnosed with a knee sprain on an old meniscal tear. (R. 650, 657.)

Claimant returned to Advocate two months later in May of 2010, where she complained that she had re-injured her left knee following another fall. (R. 626.) Once again, her doctors obtained x-rays of her left knee, which showed knee joint effusion, as well as advanced osteoarthritic changes in the knee. (R. 634.) She was advised to take pain medications (including Norco and Aleve) and follow-up with her treating physician. (R. 630.)

After a gap in treatment, Claimant returned for care and treatment of her left knee in August of 2013, after she fell out of bed. (R. 829–31.) She was instructed to continue to take Norco and follow up with her orthopedist. (*Id.*) Beginning in late December of 2013, Claimant started a treatment relationship with Dr. Timothy

Froderman, M.D., which lasted through June 2014. (R. 707–19.) Dr. Froderman typically assessed Claimant with generalized anxiety disorder, lower back pain, cervical cancer, and benign hypertension; however, in terms of treatment, he primarily refilled her medical prescriptions. (*Id.*)

On February 5, 2014, Claimant presented to the hospital and was admitted for inpatient care after three episodes of syncope (temporary loss of consciousness), while she was incarcerated. (R. 743-47.) It was noted that she had recently learned she had cervical cancer and felt depressed. (R. 747.) She reported abdominal pain, dizziness, depression and back pain. (*Id.*)

On June 21, 2014, Claimant was admitted to Advocate after experiencing several episodes of "unresponsiveness" where she would stand still and stare. (R. 807.) She explained to Dr. Mark Trelka, M.D., that she had no memory of the episodes and would come out of them after two to four minutes. (R. 807-08.) Although Claimant admitted to using cocaine four days before her most recent episode, she stated that they were not associated with any drug use; however, her toxicology screen was positive for opiates and benzodiazepines. (R. 808–10.) Dr. Trelka opined that her condition may be due to complex partial seizures and advised her to avoid dangerous machinery and climbing ladders for at least six months. (R. 808–09.)

In connection to her seizures, Claimant underwent an CT scan of her cervical spine, which revealed mild degenerative arthritic changes at C6-C7 with central canal narrowing, (R. 768), and a CT scan of her abdomen and pelvis which revealed grade 2 spondylolisthesis at L5-S1. (R. 768–70.) A magnetic resonance angiography ("MRA"), and MRI of her head and neck were all within normal limits. (R. 813, 826.)

Next, Claimant presented to the emergency room on August 12, 2014 complaining of back pain, due to no specific incident. (R. 892–95.) Upon examination, she demonstrated normal strength but had painful and limited range of motion in her lumbar spine. (R. 880.) She was diagnosed with chronic back pain and discharged with pain medications. (R. 894, 880.) By November of 2014, her examinations revealed normal range of motion in her musculoskeletal system. (R. 902.)

While she was incarcerated in January 2015, Claimant attempted suicide by stabbing herself in the left side of her neck with a pencil. (R. 913.) She was taken to the emergency room at Vista Medical Center ("Vista"), where it was noted that she had minimal bruising in the area because she did not deeply penetrate her neck. (R. 916, 934.) Her doctors chose to keep her on medication, but reported that she exhibited attention-seeking behavior. (R. 930.)

After her release from jail, Claimant was admitted to Northern Illinois Medical Center after she attempted suicide by overdosing on a combination of Trazadone, Benazepril, and Hydrochlorothiazide. (R. 988, 1008.) At this time, she reported feeling depressed and abusing alcohol. (R. 1008.) She also admitted to smoking marijuana. (R. 1008.) Following treatment and poison control, Claimant was characterized as stable, but she was diagnosed with bipolar disorder type II. (R. 969, 1009.)

Two weeks after her husband's death in August 2015, Claimant was taken by the police to Vista for alcohol abuse and suicidal ideation. (R. 1059, 1067.) Claimant admitted to a history of opiate and heroin abuse since October of 2014, and her drug screen was positive for both opiates and cocaine. (R. 1067, 1069.) During her recovery, she expressed concerns about remaining sober, and was subsequently

offered a place at the Oxford house, a recovery house. (R. 1071.) She was discharged on September 1, 2015, denying any thoughts of wanting to harm herself. (*Id.*)

### 2. Agency Consultants

Claimant presented to examining consultant, Dr. Kenneth M. Levitan, M.D., S.C., on May 3, 2006 for a psychiatric examination. (R. 563-65.) Upon examination, Dr. Levitan noted that Claimant had paranoid concerns, as well as difficulty concentrating. (R. 565.) She also displayed inappropriate brightness and laughter at times, even when she explained she was feeling more anxious and stressed. (*Id.*) Dr. Levitan also observed a hypomanic affect. (R. 563, 565.) Dr. Levitan diagnosed Claimant with bipolar affective disorder, past chronic drug abuse, and chronic alcohol abuse with probable chronic alcoholism. (R. 565) As a result of his diagnoses, Dr. Levitan opined that she could perform simple and routine tasks; would have trouble handing regular work pressure and stress; could communicate with co-workers and supervisors; and could follow, understand, and retain instructions. (*Id.*) He strongly recommended Claimant enroll in psychiatric care. (*Id.*)

On August 13, 2014, State Agency consultant Dr. Charles Galle, M.D., reviewed Claimant's medical evidence of record and opined that she was not disabled. (R. 114–24.) Dr. Galle first determined that Claimant would have no exertional limitations; however, based on Claimant's history of seizures, Dr. Galle stated that Claimant should only occasionally climb ramps and stairs, never climb ladders or scaffolds, and avoid concentrated exposure to hazards such as heights or machinery. (R. 122-23.) He did not find that she had any other postural or environmental limitations, and he opined that she would have "unlimited" ability to kneel, crouch, stoop, and crawl. (R. 122.)

## C.    Claimant's Testimony

As of the date of her hearing, Claimant was 45 years old and living with a friend. R. 52-53.)  She had obtained part-time employment at a small restaurant where she worked from 9:00 a.m. until 2:00 p.m., three days per week.  (R. 54.)  During her shift, she was typically on her feet for three hours and never lifted more than five pounds.  (R. 54–55.)  She testified that she made around $60 per week from her paycheck and tips combined.  (R. 55.)  Prior to that, she worked at her husband's construction company doing secretarial work, such as typing up contracts and proposals.  (R. 55.)  She and her husband both worked out of their home.  (R. 56.)  She stopped doing this work when her husband passed away and the company stopped doing business.  (*Id.*)

She stated that she has breakdowns and does not trust people as a result of being date raped many years ago.  (R. 59-60.)  Her current medications include Benezepril for high blood pressure, Xanax for anxiety, Traxadome and Celexa. (R. 60.)  She testified that her medications do help with her symptoms.  (*Id.*)

Claimant was incarcerated twice – once for theft and then again for violating her probation when she failed to complete community service.  (R. 63.)  While incarcerated, she asked to be placed in segregation because she preferred being alone.  (*Id.*)  She received some mental health treatment in prison for depression and bi-polar disorder. (*Id.*)

With regard to substances, Claimant testified that she used to drink one beer per week, but had not consumed alcohol since an incident with her alcoholic mother-in-law in October 2014.  (R. 75.)  She also explained that she had not used marijuana since

1998, or cocaine since about 2010.  (R. 76.)  She testified that she did not use any other drugs.  (*Id.*)

Claimant stated that she was currently not under treatment for her back, so in order to relieve her pain she used heating pads, took hot baths, and tried to elevate her legs.  (R. 66.)  She reported that her back pain prevented her from working, or sitting or standing comfortably.  (R. 66–67.) She believes she can stand for one hour and sit for 30 minutes.  (R. 67.)

In addition to impacting her ability to postulate, Claimant testified that her back pain interrupted her sleep, causing her to sleep only four hours per night.  (R. 68.)  She stated that Xanax helps her sleep, although it is primarily prescribed for anxiety.  (*Id.*)  Because she has trouble sleeping at night, Claimant stated she naps daily.  (R. 69.)  Claimant also testified that she had experienced memory loss since her stroke. (R. 73.)  Claimant reported feeling bouts of depression and feeling like a failure.  (*Id.*)  She also testified that she experiences memory loss as result of a stroke and she noted problems dealing with stress.  (*Id.*)

### D.    Medical Expert's Testimony

An ME was present and offered testimony during the hearing.  As a result of Claimant's bipolar disorder, depressive disorder, drug abuse, and personality disorder, the ME opined that she would be capable of: understanding, remembering, and carrying out simple and detailed instructions; persisting in simple and routine tasks; occasional to frequent interactions in the workplace or with the public that were fairly uncomplicated in nature; and performing in a limited stress environment.  (R. 82–83.)

## II.    LEGAL ANALYSIS

## A. Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002); *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). We must consider the entire administrative record, but will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)); *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011). This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539 (quoting *Steele*, 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," he "must build an accurate and logical bridge from the evidence to [her] conclusion." *Clifford*, 227 F.3d at 872. At a minimum, the ALJ must "sufficiently articulate [her] assessment of the evidence to assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

## B. Analysis under the Social Security Act

In order to qualify for disability insurance benefits or supplemental security income, a claimant must be "disabled" under the Social Security Act (the "Act").  A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  The claimant has the burden of establishing a disability at steps one through four. *Zurawski*, 245 F.3d at 885–86.  If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

The ALJ followed this five step analysis.  As an initial matter, the ALJ found that Claimant met the insured status requirements of the Act through September 1, 2005. (R. 23.)  At step one, the ALJ determined that Claimant has not engaged in substantial gainful activity ("SGA") since December 31, 2000, the alleged onset date.  (R. 23–24.) At step two, the ALJ found that Claimant is suffering from the severe impairments of seizure disorder, degenerative joint disease/meniscus tear of the left knee, lumbago and grade 1-2 spondylolisthesis of L5 on S1, bipolar disorder, depression, personality

disorder, and poly-substance abuse disorder.  (R. 24–25.)  At step three, the ALJ

determined that Claimant did not have an impairment or a combination of impairments

that meet or medically equal the severity of one of the listed impairments listed in 20

C.F.R. Part 404, Subpart P, App'x 1.  (R. 25–28.)  Prior to step four, the ALJ assessed

Claimant's RFC and determined that she retained the RFC to perform light work except

she must avoid concentrated exposure to hazards, including unprotected heights and

dangerous moving machinery; could never climb ladders, ropes, or scaffolds; could

occasionally climb ramps and stairs; could frequently stoop, crouch, kneel, and crawl;

could understand, remember, and carry out instructions and persist at a simple, routine,

repetitive tasks; could have occasional to frequent interaction with supervisors,

coworkers, and the public, and work in a limited stress environment with no fast-paced

work production rate or strict quota requirements, and with simple work related

decisions.  (R. 28–37.)  At step four, the ALJ determined that Claimant had no past

relevant work.  (R. 37.)  At the final step, the ALJ determined that Claimant could

perform jobs existing in significant numbers in the national economy, such as a

cleaner/housekeeper, cafeteria attendant, and office helper.  (R. 37–38.)

## III.  DISCUSSION

Claimant argues that the ALJ: (1) mistakenly concluded that her subjective

symptoms allegations were not credible; (2) erred in assessing her RFC; and (3)

improperly weighed the opinion evidence of Dr. Levitan.  We address each of these

arguments below.

### A. The ALJ Did Not Err in her Evaluation of Claimant's Subjective Symptom Allegations.

First, Claimant contends that the ALJ erred when she found that Claimant's subjective symptom allegations were "not entirely credible." (Dkt. 17 at 19–21.) As an initial matter, the Court notes that the Social Security Administration (the "Administration") has recently updated its guidance about evaluating symptom severity in disability claims. *See* SSR 16-3p, 2016 WL 1119029 (effective March 28, 2016). The new rule eliminates the term "credibility" from the SSA's sub-regulatory policies to "more closely follow [the] regulatory language regarding symptom evaluation" and to "clarify that subjective symptom evaluation is not an examination of the individual's character." *Id.* at *1; *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) ("The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character.") Though SSR 16-3p post-dates the ALJ's hearing in this case, the application of a new social security regulation to matters on appeal is appropriate where, as here, the new regulation is a clarification of, rather than a change to, existing law. *Pope v. Shalala*, 998 F.2d 473, 482–83 (7th Cir. 1993), overruled on other grounds by *Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999); *see also Hernandez v. Colvin*, No. 15-cv-3817, 2016 WL 4681227, at *7 (N.D. Ill. Sept. 7, 2016). Therefore, it is appropriate to evaluate Claimant's descriptions of her subjective symptoms pursuant to both existing case law and the guidance the Administration has provided in SSR 16-3p.

As before, under SSR 16-3p, the ALJ must carefully consider the entire case record and evaluate the "intensity and persistence of an individual's symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities." SSR 16-3p, 2016 WL 1119029, at *2. The ALJ is obligated to consider all relevant medical evidence and may not cherry-pick facts to support a finding of non-

disability while ignoring evidence that points to a disability finding. *Goble v. Astrue*, 385 Fed. Appx. 588, 593 (7th Cir. 2010.) However, the ALJ need not mention every piece of evidence so long as she builds an accurate and logical bridge from the evidence to her conclusion. *Id.* In making a credibility determination, the ALJ "may not disregard subjective complaints merely because they are not fully supported by objective medical evidence." *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995.)

SSR 16-3p requires the ALJ to consider the following factors in addition to the objective medical evidence: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness and side effects of medication; (5) any treatment, other than medication, for relief of pain or other symptoms; (6) any measures the claimant uses to relieve the pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. SSR 16-3p, 2016 WL 1119029, at *7. The Court will only reverse the ALJ's credibility finding if it is "patently wrong." *See Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). The ALJ's credibility determination is patently wrong if it lacks "any explanation or support." *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008).

Here, the ALJ discounted part of Claimant's subjective allegations due to a lack of corroborating objective medical evidence, disingenuous testimony, and her part-time employment. (R. 28-37.) The ALJ first discounted Claimant's testimony due to insufficient "objective support for the consistency, frequency, or the symptom level that [Claimant] alleged she ha[d]." (R. 34.) In her decision, the ALJ explained that

Claimant's record primarily contained records of emergency room visits rather than evidence of ongoing treatment, and cited to several instances where Claimant had reported to the emergency room for left knee and back pain (September 2009, November 2009, May 2010, August 2013, August 2014) and substance abuse (June 2014, May 2015, and August 2015), as well as attempted suicide (February 2001, September 2008, January 2015). (R. 28–37.) In contrast to her emergency visits, the ALJ noted that Claimant generally presented to her primary care physician, Dr. Timothy Froderman, for medication and prescription refills, rather than physical examinations. (R. 32.) As a whole, the ALJ found many of Claimant's issues to be "transient" with no-long term limitations to support her claim of disability. (R. 34.)

The ALJ also found Claimant's mental and physical examinations did not demonstrate significant abnormalities or problems. (R. 34.) The ALJ acknowledged Claimant's June 2014 CT scans, which revealed mild degenerative changes, central canal narrowing, and grade 2 spondylolisthesis. The ALJ then pointed to later-dated examinations in August and November 2014, which revealed Claimant's musculoskeletal system was normal aside from some lumbar tenderness. (R. 32–33.) Regarding Claimant's knee pain, the ALJ noted the 2010 x-rays showing advanced deterioration of her left knee and her 2013 prescription for pain, but noted that Claimant was not under treatment for her knee at the time of her decision. (R. 31-34.) Moreover, in terms of Claimant's seizures, she pointed out that Claimant's August 2014 MRI and MRA with Dr. Trelka were both normal, and her November 2014 head CT scan revealed no abnormalities. (R. 32.) These findings lead the ALJ to determine that Claimant's severe impairments were not disabling as she alleged.

Next, the ALJ determined that Claimant had not been forthright about her drug usage and alcohol consumption, which further undermined her credibility. (R. 34.) In her decision, the ALJ recounted several instances involving drug and alcohol use that conflicted with Plaintiff's testimony that she had stopped using durgs and marijuana years prior. The ALJ noted there were records indicating a heroin withdrawal (June 2014), testing positive for cocaine, opiates, and benzodiazepines (June 2014), an intentional drug overdose after becoming intoxicated (May 2015), smoking marijuana (May 2015), and a relapse with alcohol and heroin (September 2015). (R. 32–34.) The ALJ's thorough consideration of this inconsistent evidence adequately supports her decision to question Claimant's credibility. *See Summers v. Berryhill,* 864 F.3d 523, 526-28 (7th Cir. 2017) (upholding the ALJ's credibility finding based in part on claimant's inconsistent statements about her use of alcohol and drugs).

Third, the ALJ pointed to Claimant's ability to maintain part-time work as a factor that detracted from her credibility. (R. 24.) It is proper for an ALJ to find that a claimant's ability to perform part-time work during an alleged period of disability can curtail her credibility, *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008). Claimant argues the ALJ placed too much emphasis on her part-time job, and wrongfully equated it to an ability to sustain full-time employment. (Dkt. 17. at 20–21.) But we find that Claimant is overstating the ALJ's findings. The ALJ stated that the standing, walking, and social requirements of Claimant's job were "were inconsistent with her allegedly disabling physical and mental limitations."[2] (R. 24.) She then acknowledged that

---

[2] Here, the ALJ included a portion of her analysis regarding Claimant's part-time employment under her discussion of Claimant's SGA. (R. 24.) This is of no consequence as it is proper for the Court to read the ALJ's decision as a whole. *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004).

Claimant's employment was only one of many factors to consider when addressing her credibility, and the ALJ appropriately used it is as additional support for her conclusion that Claimant was not entirely credible.  (*Id.*)  *Berger,* 576 F.3d at 546 ("claimant's work…albeit on a part-time basis…cuts against his claim that he was totally disabled.").

Finally, the ALJ discounted Claimant's subjective symptom allegations due to her inconsistent compliance with her medications.  (R. 34.)  Under SSR 16-3p, an ALJ may not make an adverse credibility finding without first exploring any explanation a claimant may have for not complying with treatment."  SSR 16-3p at *8.  While the ALJ here did not inquire into Plaintiff's failure to comply with her medications, "[n]ot all of the ALJ's reasons must be valid as long as *enough* of them are."  *Halsell v. Astrue*, 357 Fed. Appx 717, 722–723 (7th Cir. 2009) (emphasis in original).  Because the ALJ cited other sound reasons for discounting Claimant's testimony, we cannot find that her credibility determination is patently wrong.  *Berger*, 516 F.3d at 546 (finding that although "[s]ome of the ALJ's findings regarding [the claimant's' credibility [were] a bit harsh," it was not patently wrong because there was "some support in the record" for the ALJ's determination) (internal quotations and citation omitted).  Accordingly, we find that the ALJ properly evaluated Claimant's subjective symptom allegations.

## B. The ALJ's RFC Determination was Supported by Substantial Evidence

Next, Claimant argues that the ALJ's RFC determination was unsupported by substantial evidence.  In assessing a claimant's RFC, which is "the maximum that a claimant can still do despite [her] mental and physical limitations," the ALJ must consider the medical evidence in the record and all other relevant evidence, including the claimant's testimony regarding [her] impairments. *Craft v. Astrue*, 539 F.3d 668,

675–76 (7th Cir. 2008). "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96–8p, 1996 WL 374184, at *7.

Claimant's first contention is that the ALJ failed to articulate an evidentiary basis to support the functional limitations she included in her RFC determination. (Dkt. 17 at 9–16.) We find Claimant's argument to be unpersuasive for several reasons. First, Claimant suggests that the ALJ created an "evidentiary deficit" when she rejected the opinion of non-examining State Agency consultant, Dr. Charles Galle, and then attempted to fill the alleged "deficit" with her own lay understanding of the medical evidence. (Dkt. 17 at 10–11.) In his August 2014 opinion, Dr. Galle suggested that Claimant could perform work at all exertional levels, limited to occasionally climbing ramps and stairs, never climbing ladders or scaffolds, and avoiding concentrated exposure to hazards such as heights or machinery. (R. 122–23.) In her determination, the ALJ stated that the consultant's opinion could arguably be supported based on Claimant's history of conservative treatment for pain; however, she explained that Claimant's history of trauma, left knee and spine conditions, and the overall subjective nature of her pain lead her to believe Claimant could only sustain work below a medium exertional level.[3] (R. 35.) Although she did not adopt the consultant's opinion as a whole, the ALJ then included Dr. Galle's postural and environmental limitations in her ultimate RFC assessment, thereby according some weight to his findings, albeit, not explicitly. Despite Claimant's argument to the contrary, an ALJ is not required to "rely

_____

[3] In her decision, the ALJ mistakenly stated that Dr. Galle restricted Claimant to work at a medium exertional level. (R. 35.) Dr. Galle stated that Claimant would have no exertional limitations. (R. 122.)

entirely on a particular physician's opinion" when she formulates her RFC, *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th. Cir. 2007), nor is she required to adopt each medical opinion as a whole. *Reyes v. Colvin*, No. 14 C 7359, 2015 WL 6164953, at \*13 (N.D. Ill. Oct. 20, 2015) ("The rule in this circuit is that an ALJ may choose to adopt only parts of [a medical] opinion.") (internal quotations and citations omitted).

Claimant also argues that the ALJ "failed to explain how she concluded that [Claimant] could frequently stoop, kneel, crouch, and crawl." (Dkt. 17 at 11.) While the ALJ did not explicitly rely on a medical source opinion for this portion of her RFC determination, the limitations she detailed were more restrictive than those suggested by the medical opinions of record. In fact, State Agency consultant Dr. Galle, the only medical source to offer an opinion regarding Claimant's postural limitations, recommended that Claimant would not have any restrictions with regard to stooping, kneeling, crouching, and crawling. Therefore, Claimant has failed to show that substantial evidence does not support the ALJ's RFC assessment.

Next, Claimant argues that the ALJ failed to provide evidentiary support for her determination that Claimant's seizure disorder would prevent her from climbing ladders, ropes, and scaffolds, and require her to avoid concentrated exposure to hazards. (Dkt. 17 at 12.) This argument also lacks merit. In her decision, the ALJ articulated that she accorded great weight to the opinion of Dr. Trelka, who advised Claimant not to climb ladders or operate dangerous machinery for six months following her seizures. (R. 36.) Dr. Trelka's finding was confirmed by the opinion of Dr. Galle, who explained that Claimant should: only occasionally climb stairs, never climb ladders or scaffolds, and avoid concentrated exposure to heights and machinery as a direct result of her history

of seizures.  (R. 122–123.)  Because the ALJ relied upon both of these opinions in formulating her RFC, Claimant's argument can be easily dismissed.

Finally, Claimant alleges that the ALJ's RFC determination was deficient because the ALJ failed to explain why she did not find additional functional limitations in light of her testimony that she elevated her leg for pain relief, needed to nap during the day due to poor nighttime sleep, and had impaired memory as a result of her stroke.  (Dkt. 17 at 13–16.)  When determining a claimant's RFC, an ALJ need only incorporate those limitations which she finds are supported by the evidence.  *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014).  Here, the ALJ explained that Claimant's memory loss and need to nap would not result in any additional work-related limitations because the only evidence of their disabling effect was Claimant's testimony, which she had previously determined was not entirely credible.  (R. 34–35.)  While the ALJ did not explicitly state that she also discredited Claimant's allegations that she must elevate her legs, an ALJ need not address every piece of testimony or evidence as long as she provides "some glimpse in to her reasoning."  *Dixon*, 270 F.3d at 1176.  Moreover, the ALJ acknowledged the medical records regarding Claimant's leg pain and her orthopedic evaluations, but she also noted that Claimant was no longer undergoing treatment.  (R. 34.)  Here, it is clear that the ALJ discounted the severity of Claimant's allegations of additional disabling impairments, and therefore she was not required to incorporate them into her RFC.

Although Claimant does not take direct issue with the ALJ's evaluation of her mental RFC limitations, the Court notes they are likewise supported.  In her decision, the ALJ explained that she accorded "great weight" to the opinion of the ME who

testified at Claimant's administrative hearing. (R. 35.) In particular, the ME stated that Claimant would be capable of: understanding, remembering, and carrying out simple and detailed instructions, persisting in simple and routine tasks, occasional to frequent interactions in the workplace or with the public that were fairly uncomplicated in nature, and performing in a limited stress environment. The ALJ adopted these findings in entirety when formulating her RFC. Based on the foregoing evidence, we cannot say that the ALJ failed to articulate an evidentiary basis to support her RFC determination. Instead, we find that she built the requisite bridge between the evidence and her conclusion.

### C. The ALJ Determination Regarding Dr. Levitan's Opinion was Harmless.

Finally, Claimant alleges that the ALJ improperly discounted the opinion of state-agency physician, Dr. Levitan. (Dkt. 17 at 16–19.) When determining what weight to give to a medical source opinion, and ALJ must consider a variety of factors, including: (1) the nature and duration of the examining relationship; (2) the length and extent of the treatment relationship; (3) the extent to which medical evidence supports the opinion; (4) the degree to which the opinion is consistent with the entire record; (5) the physician's specialization if applicable; and (6) other factors which validate or contradict the opinion. 20 C.F.R. § 404.1527(c).

Here, while acknowledging Dr. Levitan's status as an examining physician and his specialty as a psychiatrist, the ALJ accorded "little weight" to his May 2006 opinion that Claimant would have difficulty handling work pressure and stress; but could perform simple and routine tasks; follow, understand, and retain instructions; and communicate with coworkers and supervisors. (R. 36.) The ALJ noted that the examining

psychiatrist's assessment "was not longitudinal", but rather "based on a single examination or snapshot of functioning." (*Id.*) (internal quotations omitted). While the ALJ did not explicitly discuss the consistency of Dr. Levitan's opinion with the rest of the record, she thoroughly outlined the other medical evidence in the record, thereby noting the other findings that were inconsistent with Dr. Levitan's sole report. We find that in doing so, the ALJ adequately explained her reasoning for rejecting some of his findings.

Moreover, after reviewing the record, it is clear to this Court that even if an ALJ on remand accorded full weight to Dr. Levitan's findings, it would not impact the ALJ's ultimate RFC determination. *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) (stating that remand is not necessary "if it is predictable with great confidence that the agency will reinstate its decision on remand" due to the overwhelming support of the record.). While formulating her RFC determination, the ALJ adopted the limitations set out by the ME at the hearing, which included, *inter alia*, limiting Claimant to: simple, routine, and repetitive tasks; understanding, remembering, and carrying out instructions; occasional to frequent interaction with coworkers, supervisors, and the public; and work in a limited-stress environment. Claimant's argument fails to explain how reconsideration of Dr. Levitan's opinion would lead to a different result, particularly when the ALJ's RFC determination accounted for each of the limitations set out by Dr. Levitan. Despite citing a litany of Dr. Levitan's other notes from his examination (such as Claimant's hypomanic affect, inappropriate brightness, and laughter), Claimant likewise fails to direct us toward any additional evidence in Dr. Levitan's opinion to suggest that greater limitations were warranted. Therefore, we find that any error the ALJ made with respect to weighing his opinion was harmless.

## IV.    CONCLUSION

For the foregoing reasons, Claimant's motion to reverse the final decision of the Commissioner or remand is denied and the Commissioner's motion for summary judgment is affirmed.


DATED: September 21, 2017

_____

The Honorable Michael T. Mason